# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| **JOHN HENRY RAMIREZ,** | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | **No. 4:21-cv-2609** |
| **BRYAN COLLIER**, Executive Director, | § | |
| Texas Department of Criminal Justice, | § | **This is a Capital Case.** |
| Huntsville, Texas, | § | |
| | § | **Mr. Ramirez is** |
| **BOBBY LUMPKIN**, Director, Texas Department | § | **scheduled to be** |
| of Criminal Justice, Correctional Institutions | § | **executed on** |
| Division, Huntsville, Texas, | § | **September 8, 2021.** |
| | § | |
| **DENNIS CROWLEY**, Warden, Texas | § | |
| Department of Criminal Justice, Huntsville, Unit, | § | |
| Huntsville, Texas, | § | |
| | § | |
| Defendants. | § | |

## SECOND AMENDED COMPLAINT PURSUANT TO 42 U.S.C. § 1983

Seth Kretzer
LAW OFFICE OF SETH KRETZER
9119 South Gessner, Suite 105
Houston, Texas 77074
Tel. (713) 775-3050
seth@kretzerfirm.com

*Counsel for John Henry Ramirez, Plaintiff*

## INTRODUCTION

1.   Plaintiff John Henry Ramirez is a devout Christian. He is also incarcerated at the Polunsky Unit of the Texas Department of Criminal Justice ("TDCJ") under a sentence of death.

2.   The State of Texas intends to execute Mr. Ramirez by lethal injection on September 8, 2021, at the Walls Unit in Huntsville, Texas, under conditions that violate the First Amendment's Free Exercise Clause and substantially burden the exercise of his religion in violation of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc, *et seq*.

3.   Through the requisite TDCJ administrative channels, Mr. Ramirez has requested the presence of his spiritual advisor, Pastor Dr. Dana Moore, in the execution chamber before and during his execution, and he has requested that Pastor More lay his hands upon him at the time of his death and pray verbally.

4.   The verbalization of prayer is a long-held and practiced tradition in Christianity in general.  The vocalization of Scripture is also specific to the Protestant belief system to which Mr. Ramirez adheres.

5.   Mr. Ramirez's request was denied. He has properly exhausted all administrative remedies available to him under institutional policy.

6.   On August 19, 2021, General Counsel for TDCJ, Ms. Kristen Worman, delivered a letter stating that the approved spiritual advisor will be prohibited

from touching Ramirez or vocalizing during the execution. That means that Pastor Moore will not be able to pray aloud.  Pastor Moore will not be able to read or quote Scripture verbally. Because of this spiritual "gag order" that TDCJ is placing on Pastor Moore's voice, Ramirez will not be able to hear the liturgy- or the Word- or the prayers- of his spiritual minister as he dies and departs this world.

7.   In other words, TDCJ is imposing an unholy Trinity of Constitutional violations; 1) vocal *prayer* by a spiritual minister is prohibited as a member of his Church and his flock is dying; 2) a pastor may not *read Scripture* from the *Bible* aloud to his dying parishioner, and 3) Ramirez will not be able to *hear* any of the spiritual words of comfort by his Church and minister, or the Word of God, or the Holy Scriptures, all banned by the Defendants.

8.   Relief is necessary to ensure that Mr. Ramirez is executed only in a manner that does not substantially burden the exercise of his religious beliefs and does not violate his rights under the Free Exercise Clause or RLUIPA.

**JURISDICTION**

9.   This Court has jurisdiction under 42 U.S.C. §§ 2000cc-1, 28 U.S.C. §§ 1343, 1651, 2201, and 2202, and under 42 U.S.C. § 1983.

2

## VENUE

10.  Venue lies in this Court under 28 U.S.C. § 1391 because Defendants maintain offices in the Southern District of Texas. Venue is also proper because the execution will occur in this district.

## PARTIES

11.  Plaintiff John Henry Ramirez is incarcerated under a sentence of death at the Polunsky Unit of TCDJ in Livingston, Texas. He is scheduled to be executed September 8, 2021.

12.  Defendant Bryan Collier is the Executive Director of TDCJ. He is being sued in his official capacity.

13.  Defendant Bobby Lumpkin is the director of the Correctional Institutions Division of TDCJ. He is being sued in his official capacity. Mr. Lumpkin is the individual the trial court ordered to carry out the execution.

14.  Defendant Dennis Crowley is the senior warden of the Huntsville Unit, which is the unit where executions take place. He is being sued in his official capacity. Because Mr. Crowley is the warden of the Huntsville Unit, he supervises executions in Texas.

## FACTUAL BACKGROUND

15.  For approximately five years, since 2016, Pastor Dr. Dana Moore has ministered to Plaintiff Ramirez. Pastor Moore is an ordained minister who leads

a congregation of roughly 200 people at Second Baptist Church in Corpus Christi, Texas. *See* https://2bc.org/about-us/. Dr. Moore is a graduate of Baylor University (B.A. in religion and history) and Southwestern Baptist Theological Seminary (Masters of Divinity and Ph.D. in Old Testament).

16. Pastor Moore and Plaintiff Ramirez have corresponded and visited over the years. Pastor Moore has guided Mr. Ramirez in his practice of his religious faith. *See Exhibit 2*, Affidavit of Pastor Moore. Ramirez is a member of Second Baptist Church. *See* Sillman, Daniel, "Can This Texas Pastor Lay Hands on an Inmate During Execution," *Christianity Today*, (August 23, 2021) (online) (https://www.christianitytoday.com/news/2021/august/ramirez-execution-death-row-dana-moore-prayer-hands-touch.html).

17. Until April 2019, and consistent with longstanding tradition nationwide, TDCJ allowed TDCJ-approved chaplains in the execution chamber to guide persons being executed into the afterlife according to their religious beliefs. Between 1982 and March 2019, Texas conducted 560 executions pursuant to this policy.

18. In March 2019, TDCJ refused inmate Patrick Murphy's request that his Buddhist spiritual advisor accompany him in the chamber during the scheduled execution. *See Murphy v. Collier*, 139 S. Ct. 1475 (2019) (mem.). After TDCJ refused Murphy's request, Murphy filed a request for a stay of execution in the

Supreme Court and sought to challenge TDCJ's decision on equal protection and First Amendment grounds. *See id.*

19. On March 28, 2019, the Supreme Court granted a stay of execution and issued an order prohibiting TDCJ from carrying out the execution "pending the timely filing and disposition of a petition for a writ of certiorari unless the State permits Murphy's Buddhist spiritual advisor or another Buddhist reverend of the State's choosing to accompany Murphy in the execution chamber during the execution." *Murphy*, 139 S. Ct. at 1475. Justice Kavanaugh wrote a concurring opinion in which he expressed the view that "the Constitution prohibits [the] denominational discrimination" of the then-existing TDCJ policy. *Id.* at 1475-76. Justice Kavanaugh observed that a potential remedy for this denominational discrimination would be to ban *all* spiritual advisors of *any* denomination from the chamber.

20. On April 2, 2019, TDCJ adopted another, revised execution procedure to provide that "TDCJ Chaplains and Ministers/Spiritual Advisors designated by the offender may observe the execution only from the witness rooms." *Ex. 1*, Tex. Dep't Crim. Just., Execution Procedure at 8 (Apr. 2019).

21. On April 21, 2021 TDCJ adopted a new protocol. Under this new protocol, the condemned may be accompanied into the execution chamber by their personal religious advisor, who may minister to the condemned prisoner during

5

the execution. TDCJ also requires that the advisors be verified and pass a background check.

22. For the past five years, since approximately 2016, Plaintiff Ramirez has received religious counseling and spiritual advice from his spiritual advisor, Pastor Dana Moore. Mr. Ramirez has asked Pastor Moore to be present at the time of his execution to pray with him and provide spiritual comfort and guidance in the final moments of his life. Pastor Moore has agreed to accompany Mr. Ramirez in the execution chamber when he is executed, to pray with him, and to help guide him into the afterlife.  Pastor Moore needs to lay his hands on Mr. Ramirez in accordance with his and Mr. Ramirez's faith tradition. This belief is set forth in the affidavit of Pastor Moore. *Ex. 2*, Declaration of Pastor Dana Moore.

23. Every minister of every faith in the world vocalizes his or her liturgy and prayers.  But TDCJ has apparently amended its policies so as to impose a spiritual 'gag order' on religious advisors in the execution chamber.

24. The laying on of hands is a symbolic act in which religious leaders place their hands on a person in order to confer a spiritual blessing. This contact is necessary to bless and guide Mr. Ramirez at the moment of his death.

25. This practice has its basis in Christian scripture. The Apostle Philip's preaching in Samaria where a mass of people "listened eagerly . . . believed . . . [and] were

6

baptized" (<u>Acts 8:11</u>, 12) Yet these new converts did not "receive the Holy Spirit" until after "Peter and John" came to Samaria from Jerusalem and "laid their hands on them" (8:17). Similarly, when Paul later baptized a group of Ephesian disciples, it was not until he "had laid his hands on them" that "the Holy Spirit came upon them" (Paul 19:1–6).

26. Already, TDCJ has in place specific protocols to take place prior to Pastor Moore's entry into the Walls Unit. On August 26, 2021, Pastor Moore is scheduled to drive from his home in Corpus Christi to Huntsville to receive a nebulous "spiritual advisor training" at an office maintained by the Defendants at a shopping mall in that city.

27. On August 19, 2021, an attorney with the Texas Attorney General's Office who has not made an appearance in the case *sub judice* (Ms. Leah O'Leary) sent an email to the undersigned counsel which reads:

> This email is to advise you that only Mr. Ramirez's spiritual advisor will be permitted to attend the orientation. The orientation is not an open forum and ***attorneys will not be permitted to attend.***

Obviously, the undersigned was appointed to represent Ramirez, not Pastor Moore. But the State has made its point clearly: the security around this "orientation" is so strict that this citizen could not be accompanied by a lawyer even if requested to do so.

28. Pastor Moore will undergo a rigorous screening process including being screened by a metal detector and having any items he carries with him screened by an X-ray. He will be required to remove his shoes and belt for inspection. Pastor Moore also is willing to undergo additional security screening, if necessary, in order to be present in the execution chamber and to have physical contact necessary to confer a spiritual blessing and offer audible prayers that Mr. Ramirez will hear, as Mr. Ramirez is executed.

29. On June 8, 2021, inquiry was made to Ms. Kristen Worman, TDCJ General Counsel, through email whether Ms. Worman and TDCJ had made a decision regarding the presence of Ramirez's minister in the execution chamber and direct personal contact between the condemned and the pastor. *See Ex. 3*, E-mail correspondence with Ms. Kristen Worman, General Counsel for TDCJ.

30. On June 17, 2021, Ms. Worman responded via e-mail, stating that, pursuant to TDCJ policy, Pastor Moore would not be allowed to have direct, personal contact with Plaintiff Ramirez in the execution chamber. *See Ex. 3.*

31. Plaintiff Ramirez submitted an Offender Form I-60 "Offender Request to Official" to TDCJ on or about July 15, 2020. In the grievance, he requested that TDCJ allow Pastor Moore to be present in the execution chamber. He further requested that Pastor Moore be allowed to have direct, personal contact with him during the execution. *See Ex. 4.*

32. Mr. Ramirez's grievance was denied, and he filed an appeal of that denial. The appeal has yet to be decided, as best as anyone can tell. *See Ex. 4.*

33. More recently, on August 19, 2021, Ms. Worman sent a letter on official TDCJ letterhead. Pursuant TDCJ policy, the approved spiritual advisor will additionally be prohibited from vocalizing any audible spiritual prayers or scriptures during the execution. *See Ex. 7.*

## PROCEDURAL HISTORY

34. John Henry Ramirez was convicted and sentenced to death in 2008 for the 2004 killing of Pablo Castro in Nueces County, Texas. The Texas Court of Criminal Appeals ("TCCA") affirmed the conviction and death sentence on direct appeal. *Ramirez v. State*, No. AP-76,100 (Tex. Crim. App., March 16, 2011). In 2012, the TCCA denied state post-conviction relief, after evidentiary hearing and upon the trial court's report and recommendation. *Ex parte Ramirez*, No. WR-72,735-03 (Tex. Crim. App., October 10, 2012). Mr. Ramirez timely filed a petition for writ of habeas corpus in the federal district court. The district court denied relief and a certificate of appealability. *Ramirez v. Stephens*, No. 2-12-CV-410 (S.D. Tex., June 10, 2015).

35. Mr. Ramirez filed a timely notice of appeal to the United States Court of Appeals for the Fifth Circuit. That court denied a request for certificate of

appealability on February 4, 2016. The Supreme Court denied a request for certiorari review on October 3, 2016.

36. The State of Texas set an execution date on February 2, 2017. On January 27, 2017, Mr. Ramirez moved to substitute counsel and stay the execution date. This Court granted Mr. Ramirez's motion on January 31, 2017. On August 20, 2018, Mr. Ramirez filed a motion for relief from judgment in the United States District Court. The Court denied this motion on January 3, 2019. Mr. Ramirez appealed to the Fifth Circuit, which denied the request for a certificate of appealability on June 26, 2019. The Supreme Court again denied certiorari review, on March 2, 2020, and it denied rehearing on May 18, 2020.

37. The State of Texas set another execution date of September 9, 2020. In August 2020, Mr. Ramirez filed a 'spiritual advisor' claim under Section 1983. This was assigned Southern District cause number 2:20-cv-205. A copy of this previous 1983 complaint is attached *Exhibit 5*.

38. Thereafter, Ramirez and the Texas Attorney General's Office agreed to withdraw the death warrant in exchange for Ramirez's withdrawal of then-pending civil litigation.

39. More specifically, the Attorney General's Office and Ramirez reached bargain in which the state agreed to withdraw the execution date in exchange for

Ramirez's agreement to non-suit without prejudice his section 1983 case and to dismiss a funding request under 18 U.S.C. § 3599(f).

40. The August 12, 2020 filing in the underlying habeas case is attached as *Exhibit 6*, and reads in relevant part:

> On August 11, 2020, Ramirez's counsel and AAG Morris reached agreement to 1) file an agreed motion to withdraw execution date and recall death warrant in the 94th Judicial District of Nueces County in exchange for 2) Ramirez filing a motion to non-suit without prejudice his recently filed Section 1983 suit in this Court; 2:20-cv-00205 *Ramirez v. Collier*.

41. On August 14, 2020, Nueces County District Court Judge Bobby Galvan of the 94th Criminal District Court withdrew the September execution date in an order in accord with the joint motion to cancel the execution. Subsequently, Ramirez withdrew his funding motion and filed a motion to non-suit with prejudice his matters pending in federal court.

42. On February 3, 2021 the State moved to set a new execution date, and on February 5, 2021, Judge Galvan signed an order setting an execution date for Mr. Ramirez of September 8, 2021.

43. As envisaged under the August 11, 2020 agreement, Ramirez filed a new funding request, and on July 13, 2021, Judge Ramos granted in part this motion for funding under 18 U.S.C. § 3599(f).

44. Similarly, the current 1983 lawsuit is concordant with the August 11, 2020 agreement that Ramirez would not be prejudiced to resurrecting his federal civil rights lawsuit on religious grounds.

## CLAIMS FOR RELIEF

45. Mr. Ramirez re-alleges and incorporates by reference and the allegations contained in the previous paragraphs of this Complaint.

## CLAIM ONE: FIRST AMENDMENT FREE EXERCISE OF RELIGION

46. The First Amendment requires that "Congress shall make no law . . . prohibiting the free exercise of" religion. U.S. Const., amend. I. Like the Establishment Clause, the Free Exercise Clause is binding on the states. *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940) (holding that the protections of the Free Exercise Clause are incorporated by the Fourteenth Amendment against the States).

47. According to its April 2021 revised protocol, TDCJ no longer precludes TDCJ-approved spiritual advisors from entering the execution chamber. Further, in spite of this protocol, which does not address whether or not the spiritual advisor can have direct, personal contact with the condemned, Defendants have informed Mr. Ramirez that his spiritual advisor will not be allowed to be present at the moment of his execution and to confer a verbal spiritual blessing or consolation by prayer at the moment of his death via the laying on of hands

and praying audibly. In fact, the TDCJ has not indicated it will accede to Mr. Ramirez's request that his requested spiritual advisor be allowed to be present at all in the execution chamber.

48. Many Baptist ministers see the laying on of hands as a vitally important affirmation by God's people of their calling. This laying on of hands at the time of death is the affirmation of faith at the time between life and afterlife.

49. TDCJ s intent to deny Mr. Ramirez access spiritual counseling during the moments leading up to and including his execution as well as the direct personal contact and verbal audible praying violates his First Amendment rights under the Free Exercise clause and cannot be justified by a vague citation to illusory security concerns. Furthermore, TDCJ cannot demonstrate that its current security and screening protocols are inadequate, or that it could not address security concerns with further screening measures, to which Pastor Moore has indicated he is willing to submit.

50. TDCJ's current policy with regard to the presence of spiritual advisors in the execution chamber burdens Mr. Ramirez's free exercise of his Christian faith in the moments just prior to and including his execution. It burdens his free exercise of faith at his exact time of death, when most Christians believe they will either ascend to heaven or descend to hell—in other words, when religious instruction and practice are most needed. *See, e.g.*, 2 Timothy 1:6, "For this

reason I remind you to kindle afresh the gift of God which is in you through the laying on of my hands." This is the most important at the moment of his death. To Christians, the messages conveyed by God are known as the Word. The Word is God. (*See* John 1:1 "In the beginning was the Word, and the Word was with God, and the Word was God." (King James).) The vocalization of prayers and exhortations are integral to the Christian faith. (*See, e.g.*, John 1:23 ("He [John the Baptist] said, I am the voice of one crying in the wilderness, Make straight the way of the Lord, as said the prophet Esaias." (King James).)

51. When a state hinders a prisoner's ability to freely exercise his religion, reviewing courts must determine whether the law or policy is neutral and generally applicable. *Church of the Lukumi Balbao Aye, Inc. v. Hialeah*, 508 U.S. 520, 531 (1993). If it is neutral and generally applicable, it can have an "incidental effect of burdening a particular religious practice." *Ibid.* If it is not neutral and generally applicable, it must show a "compelling governmental interest" that is "narrowly tailored to advance that interest." *Ibid.*

52. Here, TDCJ's policy is not neutral. It is hostile toward religion, denying religious exercise at the precise moment it is most needed: when someone is transitioning from this life to the next. The policy is thus permissible only if it can survive strict scrutiny, which it cannot. Any argument that security concerns constitute a "compelling governmental interest" necessitating the

exclusion of Mr. Ramirez's spiritual advisor from the execution chamber and preventing him from touching the condemned or praying audibly withers when subjected to strict scrutiny, as the Constitution requires.

53. As a federal judge in this district recently noted, when making fact-findings relevant to a recent challenge to TDCJ's previous execution policy excluding all religious advisors from the execution chamber, "Speculative hypotheticals without evidentiary support do not create an unmanageable security risk." *Gutierrez v. Saenz*, No. 1:19-cv-00185 (S.D. Tex. Nov. 24,2020), ECF Doc. 124 at *29.

54. For these reasons, TDCJ's amended policy precluding Mr. Ramirez's spiritual advisor from being present at the moment of his execution and administering a final blessing via the laying on of hands and praying audibly, in accordance with Mr. Ramirez's faith tradition, violates his rights under the First Amendment's Free Exercise Clause.

### CLAIM TWO: THE RELIGIOUS LAND USE AND INSTITUTIONALIZED PERSONS ACT ("RLUIPA")

55. Mr. Ramirez incorporates paragraphs 1-54, above.

56. Even if this Court finds that TDCJ's policy does not violate Plaintiff Ramirez's First Amendment rights, it should find that the policy violates RLUIPA. RLUIPA provides in part, "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution,"

unless the burden furthers "a compelling governmental interest," and does so by "the least restrictive means." RLUIPA "alleviates exceptional government-created burdens on private religious exercise." *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005).

57. Specifically, RLUIPA states:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on the person-(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling interest.41 U.S.C. 2000cc-1(a)RLUIPA thus "alleviates exceptional government-created burdens on private religious exercise," without "elevat[ing] accommodation of religious observances over an institution's need to maintain order and safety.

> *Cutter*, 544 U.S. at 720.

58. "In RLUIPA, in an obvious effort to effect a complete separation from the First Amendment case law, Congress deleted reference to the First Amendment and defined the 'exercise of religion' to include 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief.'" *Burwell v. Hobby Lobby Stores*, 573 U.S. 682, 696 (quoting 42 U.S.C. § 2000cc-5(7)(A)). RLUIPA thus provides more "expansive protection" for religious liberty than the United States Supreme Court case law. *Holt v. Hobbs*, 574 U.S. 352, 358 (2015).

59. Prohibiting Mr. Ramirez from engaging in vitally important religious practices with a chaplain at the end of his life and including the moment of his death substantially burdens his practice of religion. *See, e.g.*, *id*, 135 S. Ct. at 862 (2015) (determining that where a prisoner shows the exercise of religion "grounded in a sincerely held religious belief," enforced prohibition "substantially burdens his religious exercise").

60. Under RLUIPA, a prison may not impose a substantial burden on a prisoner's religious exercise unless doing so satisfies the Supreme Court's "strict scrutiny" test; the challenged policy must be "the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. §2000cc-1(a).

61. The strict scrutiny standard is "exceptionally demanding." *Holt*, 574 U.S. 352, 353, quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. at 728.

62. Defendants have not employed the least restrictive means to further a compelling interest. Defendants have the burden to prove this defense. *See, Holt*, 574 U.S. at 357, 362.

63. As a federal judge in this district recently noted, when making fact-findings relevant to a recent challenge to TDCJ's execution policy excluding all religious advisors from the execution chamber, "Speculative hypotheticals without evidentiary support do not create an unmanageable security risk." *Gutierrez v. Saenz*, *supra*, ECF Doc. 124 at *29.

17

64. TDCJ's amended policy, including as stated by Ms. Worman's, General Counsel's August 19, 2021 letter, places a substantial burden on Mr. Ramirez's practice of a sincerely-held religious belief in the "spiritually charged final moments of life," leading up to and including his execution, when religious observance and spiritual guidance are most critical. No compelling security interest justifies the burden on his religious exercise.

65. Accordingly, if the Court concludes that TDCJ's revised policy does not violate the First Amendment, it should decide that the policy violates RLUIPA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff John Henry Ramirez prays that this Court provide relief as follows:

1.    A declaratory judgment that TDCJ's amended policy, including as stated by Ms. Worman's, General Counsel's August 19, 2021 letter, violates Mr. Ramirez's First Amendment rights under the Free Exercise Clause;

2.    A declaratory judgment that TDCJ's amended policy violates Mr. Ramirez's rights under RLUIPA; and

3.    A permanent injunction prohibiting Defendants from executing Mr. Ramirez until they can do so in a way that does not violate his rights.

4.     More specifically, such injunction must require the TDCJ to allow the approved spiritual advisor to both lay his hands on Ramirez's body and vocalize any prayers or scriptures, during the execution.

Respectfully submitted,

*/s/ Seth Kretzer*
Seth Kretzer
TBN: 24043764
LAW OFFICE OF SETH KRETZER
9119 South Gessner, Suite 105
Houston, Texas 77074
Tel. (713) 775-3050
seth@kretzerfirm.com

## VERIFICATION

I, Seth Kretzer, attorney for the Plaintiff in the above-titled action, state that to the best of my knowledge and belief, the facts set forth in this Complaint are true.

Dated: August 22, 2021.

*/s/ Seth Kretzer*
Seth Kretzer

## CERTIFICATE OF SERVICE

I certify that I served a true and correct copy of the above pleading to the following on August 22, 2021 and all counsel of record by ECF:

AAG Leah O'Leary
Leah.OLeary@oag.texas.gov

19

Jenna Schmidt
Jenna.Schmidt@oag.texas.gov

AAG Jennifer Morris
Jennifer.Morris@oag.texas.gov

/s/ Seth Kretzer

Seth Kretzer

**Exhibit 1**

# TEXAS DEPARTMENT OF CRIMINAL JUSTICE

## Correctional Institutions Division



## EXECUTION PROCEDURE

### April 2019

## *ADOPTION OF EXECUTION PROCEDURE*

In my duties as Division Director of the Correctional Institutions Division, I hereby adopt the attached Execution Procedure for use in the operation of the Texas Department of Criminal Justice Death Row housing units and perimeter functions. This Procedure is in compliance with Texas Board of Criminal Justice Rule §152.51; §§492.013(a), 493.004, Texas Government Code, and Article 43.14 – 43.20, Code of Criminal Procedure.


Lorie Davis
Director, Correctional Institutions Division

4·2·19
Date

# EXECUTION PROCEDURES

## PROCEDURES

### I. Procedures Upon Notification of Execution Date

A. The clerk of the trial court pursuant to Tex Code of Criminal Procedure art. 43.15 shall officially notify the Correctional Institutions Division (CID) Director, who shall then notify the Death Row Unit Warden, and the Huntsville Unit Warden of an offender's execution date. Once an execution date is received, the Death Row Unit Warden's office shall notify the Unit Classification Chief, and the Death Row Supervisor.

B. The Death Row Supervisor shall schedule an interview with the condemned offender and provide him with the Notification of Execution Date (Form 1). This form provides the offender with a list of the information that shall be requested from him (2) two weeks prior to the scheduled execution.

C. The condemned offender may be moved to a designated cell. Any keep-on-person (KOP) medication shall be confiscated and administered to the offender as needed by Unit Health Services staff.

### II. Stays of Execution

A. Official notification of a stay of execution shall be delivered to the CID Director, the Death Row Unit Warden, and the Huntsville Unit Warden through the Huntsville Unit Warden's Office. **Staff must not accept a stay of execution from the offender's attorney.** After the official stay is received, the Death Row Unit Warden's office shall notify the Unit Classification Chief and Death Row Supervisor.

B. Designated staff on the Death Row Unit shall notify the offender that a stay of execution has been received.

### III. Preparation of the Execution Summary and Packet

A. Two Weeks (14 days) Prior to the Execution

1. The Death Row Unit shall begin preparation of the Execution Summary. The Execution Summary (Form 2) and the Religious Orientation Statement (Form 3) shall be forwarded to the Death Row Supervisor or Warden's designee for completion. A copy of the offender's current visitation list and recent commissary activity shall also be provided.

2. The Death Row Supervisor shall arrange an interview with the condemned offender to gather the information necessary to complete the Execution Summary and Religious Orientation Statement.

3. An offender may request to have his body donated to the Texas State Anatomical Board for medical education and research. The appropriate paperwork shall be supplied to the offender upon request.

4. The Execution Summary must be completed and returned by the Death Row Supervisor or Warden's designee in sufficient time to be forwarded to the CID Director's Office by noon of the 14th day. After approval by the CID Director, the summary shall be forwarded to the Death Row Unit Chaplain, the Huntsville Unit Warden's Office, and the Communications Department.

5. If the offender wishes to change the names of his witnesses, and it is less than fourteen (14) days prior to the scheduled execution, the offender shall submit a request in writing to the CID Director through the Death Row Unit Warden, who shall approve or disapprove the changes.

6. The Death Row Unit is responsible for completion of the Execution Packet which shall include:
   a. Execution Summary;
   b. Religious Orientation Statement;
   c. Copy of the Offender Travel Card;
   d. Current Visitation List;
   e. Execution Watch Notification;
   f. Execution Watch Logs;
   g. I-25 Offender's Request for Trust Fund Withdrawal;
   h. Offender Property Documentation (PROP-05 and PROP-08); and
   i. Other documents as necessary.

7. The Death Row Supervisor or the Warden's designee shall notify staff (Form 4) to begin the Execution Watch Log (Form 5).

8. The Execution Watch Log shall begin at 6:00 a.m. seven (7) days prior to the scheduled execution. The seven (7) day timeframe shall not include the day of the execution. The offender shall be observed, logging his activities every 30 minutes for the first six (6) days and every 15 minutes for the remaining 36 hours. The Communications Department may request information from the Execution Watch Log on the day of execution.

9. The original Execution Packet and the offender's medical file shall be sent with the condemned offender in the transport vehicle to the Huntsville Unit or the Goree Unit for a female offender. The Death Row Unit Warden shall maintain a copy of the Execution Packet on the Death Row Unit.

10. If there are any changes necessary to the Execution Packet, staff shall notify the CID Director's Office and the Huntsville Unit Warden's Office.

B. The Day of Execution

1. On the morning of the day of the execution prior to final visitation, all of the offender's personal property shall be packed and inventoried. The property officer shall complete an "Offender Property Inventory" (PROP-05) detailing each item of the offender's property. The property officer shall also complete a "Disposition of Confiscated Offender Property" (PROP-08) indicating the offender's choice of disposition of personal property.

    a. If disposition is to be made from the Huntsville Unit a copy of the property forms should be maintained by the Death Row Unit Property Officer and the originals forwarded to the Huntsville Unit with the property.

    b. If disposition is to be made from the Death Row Unit a copy of the property forms will be placed in the Execution Packet and the original forms maintained on the Death Row Unit through the completion of the disposition process.

    c. The Mountain View Unit Warden shall ensure that a female offender brings personal hygiene and gender-specific items to the Huntsville Unit as appropriate.

2. Designated staff shall obtain the offender's current Trust Fund balance and prepare the Offender's Request for Trust Fund Withdrawal (I-25) for completion by the offender.

    a. The following statement should be written or typed on the reverse side of the I-25, "In the event of my execution, please distribute the balance of my Inmate Trust Fund account as directed by this Request for Withdrawal." The offender's name, number, signature, thumbprint, date, and time should be below this statement. Two (2) employees' names and signatures should be below the offender's signature as witnesses that the offender authorized the form.

    b. This Request for Withdrawal form shall be delivered to the Inmate Trust Fund for processing by 10:00 a.m. CST the next business day following the execution.

3. A female offender may be transported to the Goree unit prior to the day of the execution. The Execution Transport Log for Female Offenders (Form 7) shall be initiated at the Mountain View Unit. The Goree Unit staff will initiate the Execution Watch Log upon arrival on the Goree Unit, permit visitation as appropriate and transport the offender to the Huntsville Unit.

The Transport Log shall resume when the offender departs the Goree Unit.

4. The condemned offender shall be permitted visits with family and friends on the morning of the day of the scheduled execution. No media visits shall be allowed at the Goree Unit.

   NOTE: Special visits (minister, relatives not on the visitation list, attorney, and other similar circumstances) shall be approved by the Death Row or Goree Unit Warden or designee. Exceptions may be made to schedule as many family members to visit prior to the offender's scheduled day of execution. These are considered to be special visits. No changes shall be made to the offender's visitation list.

5. The Execution Watch Log shall be discontinued when the Execution Transport Log for Male Offenders (Form 6) is initiated.

6. When appropriate the offender shall be escorted to 12 building at the Polunsky or the designated area at the Mountain View or Goree Unit and placed in a holding cell. The appropriate Execution Transport Log shall be initiated and the offender shall be prepared for transport to the Huntsville Unit. The offender shall be removed from the transport vehicle at the Huntsville Unit and escorted by Huntsville Unit security staff into the execution holding area.

7. Any transportation arrangements for the condemned offender between units shall be known only to the Wardens involved, the CID Director, as well as those persons they designate as having a need to know. No public announcement shall be made concerning the exact time, method, or route of transfer. The CID Director's Office and the Communications Department shall be notified immediately after the offender arrives at the Huntsville Unit

8. When the offender enters the execution holding area the Execution Watch Log shall immediately resume. The restraints shall be removed and the offender strip-searched.

9. The offender shall be fingerprinted, placed in a holding cell, and issued a clean set of TDCJ clothing.

10. The Warden shall be notified after the offender has been secured in the holding cell. The Warden or designee shall interview the offender and review the information in the Execution Packet.

11. Staff from the Communications Department shall also visit with the offender to determine if he wishes to make a media statement and to obtain authorization, if necessary, to release the statement.

12. The offender may have visits with a TDCJ Chaplain(s), a Minister/Spiritual Advisor who has the appropriate credentials and his attorney(s) on the day of execution at the Huntsville Unit; however, the Huntsville Unit Warden must approve all visits.

13. There shall be no family or media visits allowed at the Huntsville Unit.

## IV. Drug Team Qualifications and Training

A. The drug team shall have at least one medically trained individual. Each medically trained individual shall at least be certified or licensed as a certified medical assistant, phlebotomist, emergency medical technician, paramedic, or military corpsman. Each medically trained individual shall have one year of professional experience before participating as part of a drug team, shall retain current licensure, and shall fulfill continuing education requirements commensurate with licensure. Neither medically trained individuals nor any other members of the drug team shall be identified.

B. Each new member of the drug team shall receive training before participating in an execution without direct supervision. The training shall consist of following the drug team through at least two executions, receiving step-by-step instruction from existing team members. The new team member will then participate in at least two executions under the direct supervision of existing team members. Thereafter, the new team member may participate in executions without the direct supervision of existing team members.

C. The Huntsville Unit Warden shall review annually the training and current licensure, as appropriate, of each team member to ensure compliance with the required qualifications and training.

## V. Pre-execution Procedures

A. The Huntsville Unit Warden's Office shall serve as the communication command post and entry to this area shall be restricted.

B. Inventory and Equipment Check

1. Designated staff on the Huntsville Unit are responsible for ensuring the purchase, storage, and control of all chemicals used in lethal injection executions for the State of Texas.

2. The drug team shall obtain all of the equipment and supplies necessary to perform the lethal injection from the designated storage area.

3. An inventory and equipment check shall be conducted.

       4.   Expiration dates of all applicable items are to be checked on each individual item. Outdated items shall be replaced immediately.

C. Minister/Spiritual Advisor and attorney visits shall occur between 3:00 and 4:00 p.m. CST unless exceptional circumstances exist. Exceptions may be granted under unusual circumstances as approved by the Huntsville Unit Warden.

D. The offender shall be served his last meal at approximately 4:00 p.m. CST.

E. The offender shall be afforded an opportunity to shower and shall be provided with clean clothes at some time prior to 6:00 p.m. CST.

F. Only TDCJ security personnel shall be permitted in the execution chamber. The CID Director or designee and the Huntsville Unit Warden or designee shall accompany the offender while in the Execution Chamber. TDCJ Chaplains and Ministers/Spiritual Advisors designated by the offender may observe the execution only from the witness rooms.

## VI. Set up Preparations for the Lethal Injection

A. One (1) syringe of normal saline shall be prepared by members of the drug team.

B. The lethal injection drug shall be mixed and syringes shall be prepared by members of the drug team as follows:

Pentobarbital - 100 milliliters of solution containing 5 grams of Pentobarbital.

C. The drug team shall have available a back-up set of the normal saline syringe and the lethal injection drug in case unforeseen events make their use necessary.

## VII. Execution Procedures

A. After 6:00 p.m. CST and after confirming with the Office of the Attorney General and the Governor's Office that no further stays, if any, will be imposed and that imposition of the court's order should proceed, the CID Director or designee shall give the order to escort the offender into the execution chamber.

B. The offender shall be escorted from the holding cell into the Execution Chamber and secured to the gurney.

C. A medically trained individual shall insert intravenous (IV) catheters into a suitable vein of the condemned person. If a suitable vein cannot be discovered in an arm, the medically trained individual shall substitute a suitable vein in another part of the body, but shall not use a "cut-down" procedure to access a suitable vein. The medically trained individual shall take as much time as is needed to properly insert the IV lines. The medically trained individual shall connect an IV administration set, and start a normal saline solution to flow at a slow rate through

one of the lines. The second line is started as a precaution and is used only if a potential problem is identified with the primary line. The CID Director or designee, the Huntsville Unit Warden or designee, and the medically trained individual shall observe the IV to ensure that the rate of flow is uninterrupted.

D. Witnesses to the execution shall be brought into the appropriate viewing area ONLY AFTER the Saline IV has been started and is running properly, as instructed by the Huntsville Unit Warden or designee.

E. The CID Director or designee shall give the order to commence with the execution.

F. The Huntsville Unit Warden or designee shall allow the condemned person to make a brief, last statement.

G. The Huntsville Unit Warden or designee shall instruct the drug team to induce, by syringe, substances necessary to cause death.

H. The flow of normal saline through the IV shall be discontinued.

I. The lethal dose of Pentobarbital shall be commenced. When the entire contents of the syringe have been injected, the line shall be flushed with an injection of normal saline.

J. The CID Director or designee and the Huntsville Unit Warden or designee shall observe the appearance of the condemned individual during application of the Pentobarbital. If, after a sufficient time for death to have occurred, the condemned individual exhibits visible signs of life, the CID Director or designee shall instruct the drug team to administer an additional 5 grams of Pentobarbital followed with a saline flush.

K. At the completion of the process and after a sufficient time for death to have occurred, the Warden shall direct the physician to enter the Execution Chamber to examine the offender, pronounce the offender's death, and designate the official time of death.

L. The body shall be immediately removed from the Execution Chamber and transported by a coordinating funeral home. Arrangements for the body should be concluded prior to execution.

VIII. Employee participants in the Execution Process shall not be identified or their names released to the public. They shall receive an orientation with the Huntsville, Goree, Polansky, or Mountain View Unit Wardens, who shall inform the employees of the TDCJ ED-06.63, "Crisis Response Intervention Support Program" (CRISP). The employees shall be encouraged to contact the Regional CRISP Team Leader following the initial participation in the execution process.

**Exhibit 2**

AFFIDAVIT OF DANA MOORE

State of Texas

              SS:

County of Nueces

       Now comes the Affiant being first duly sworn and warned of the penalties of perjury and states the following is true and accurate to the best of his knowledge and understanding

1. I am a Baptist minister who was ordained in 1983 by Long Point Baptist Church in Houston, Texas. I am currently the pastor of the Second Baptist Church in Corpus Christi, Texas and have been in this position since 2007.  This is a congregation of some two hundred members.
2. John Henry Ramirez, is a member of this church despite being on death row in Livingston, Texas.  He was welcomed by all members of the church and is a member in good standing.
3. I have visited John Ramirez for the past four years at Livingston, Texas as his spiritual advisor.  He has asked that I be his spiritual advisor in the execution chamber  on September 8, 2021.  I have accepted this request from Mr. Ramirez.  He has further requested that I touch him while he is being executed.
4. As the spiritual advisor for John Ramirez, I understand that I will be able to stand in the same room with John during his execution, but I will not be able to physically touch him. Human touch has significance and power. Many miracles of Jesus were performed by touching such as found in Matthew 8:3. The Bible teaches to anoint the sick with oil which is done via touch (James 5:14). In Mark 10:14-16 Jesus touched and blessed the children. Whenever I pray with others in a crisis situation I hold their hand or put my hand on their shoulder. In other words, I touch them. That is a significant part of our faith tradition as Baptists. I need to be in physical contact with John Ramirez during the most stressful and difficult time of his life in order to give him comfort.
5. I would request that I be allowed to touch Mr. Ramirez as he is executed as his spiritual advisor.

AFFIANT FURTHER SAYETH NAUGHT

_Dana Moore_____
Dana Moore

NOTARY CERTIFICATION

       I hereby swear and affirm that Affiant appeared before me, was sworn and stated the above is true and accurate to the best of his understanding and knowledge.

_Deborah Guerrero_____
Notary public



DEBORAH GUERRERO
Notary Public, State of Texas
Comm. Expires 03-21-2025
Notary ID 10752241

# Tab 3

**From:** Amy Lee <Amy.Lee@tdcj.texas.gov>
**Date:** March 12, 2021 at 4:56:03 PM EST
**To:** Eric Allen <eric@eallenlaw.com>
**Cc:** Kristen Worman <Kristen.Worman@tdcj.texas.gov>
**Subject: RE: John Ramirez 999544**

Mr. Allen,

TDCJ policy does not currently permit a non-TDCJ employee to be present in the execution chamber during an execution procedure. The only persons allowed inside the execution chamber during an execution are the TDCJ Correctional Institutions Division Director and the Huntsville Unit Warden. If Mr. Ramirez adds his spiritual advisor to his execution witness list, TDCJ will permit his spiritual advisor to observe the execution from the witness room. If Mr. Ramirez would like to visit with his spiritual advisor prior to the execution, the TDCJ will allow for visitation to take place at the Huntsville Unit beginning at 3:00 p.m. and ending no later than 4:00 p.m. on the day of the execution.

Amy Lee
Project Coordinator
Office of the General Counsel - TDCJ

*The information contained in this email and any attachments is intended for the exclusive use of the addressee(s) and may contain confidential, privileged, or proprietary information. Any other use of these materials is strictly prohibited. This email shall not be forwarded outside the Texas Department of Criminal Justice, Office of the General Counsel, without the permission of the original sender. If you have received this material in error, please notify me immediately by telephone and destroy all electronic, paper, or other versions.*

**Exhibit 4**

**Texas Department of Criminal Justice**

# STEP 1

## OFFENDER GRIEVANCE FORM

OFFICE USE ONLY

Grievance #: 2021095145

Date Received: APR 1 2 2021

Date Due: 5-22-21

Grievance Code: 300

Investigator ID #: I 2731

Extension Date: _____

Date Retd to Offender: APR 1 4 2021

**Offender Name:** John Henry Ramirez          **TDCJ #** 999544

**Unit:** Polunsky Unit          **Housing Assignment:** 12AA01

**Unit where incident occurred:** Polunsky Unit

---

**You must try to resolve your problem with a staff member before you submit a formal complaint. The only exception is when appealing the results of a disciplinary hearing.**

Who did you talk to (name, title)? Chaplain Gay/ Head Chaplain          When? April 2, 2021

What was their response?    We're NOT allowed to have our spiritual advisor in the death chamber w/ us at the time of execution!

What action was taken?                    NONE!

---

**State your grievance in the space provided. Please state who, what, when, where and the disciplinary case number if appropriate**

I am scheduled to be executed on Sept. 8, 2021 & have requested that I be allowed to have my spiritual advisor present in the death chamber w/ me during my execution by State. I was told I was NOT allowed that, & that is a violation of my Constitutional Rights's!

**I-127 Front** (Revised 11-2010)          **YOUR SIGNATURE IS REQUIRED ON BACK OF THIS FORM**          (OVER)

Appendix F

**Action Requested to resolve your Complaint.** That I be allowed to have my spiritual advisor in the death chamber w/ me at the time of my execution?   THANK YOU!

**Offender Signature:** _John H. Ramirez_                              **Date:** 4-11-21

**Grievance Response:**

Your grievance has been investigated. At this time, a religious authority is not permitted to be present in the execution chamber with an inmate. No further action is warranted by this office.

**Signature Authority:** _____ B. Rigsby, AW                **Date:** APR 1 4 2021

If you are dissatisfied with the Step 1 response, you may submit a Step 2 (I-128) to the Unit Grievance Investigator within 15 days from the date of the Step 1 response. State the reason for appeal on the Step 2 Form.

**Returned because:**      *Resubmit this form when the corrections are made.*

☐ 1. Grievable time period has expired.
☐ 2. Submission in excess of 1 every 7 days. *
☐ 3. Originals not submitted. *
☐ 4. Inappropriate/Excessive attachments. *
☐ 5. No documented attempt at informal resolution. *
☐ 6. No requested relief is stated. *
☐ 7. Malicious use of vulgar, indecent, or physically threatening language. *
☐ 8. The issue presented is not grievable.
☐ 9. Redundant, Refer to grievance #_____
☐ 10. Illegible/Incomprehensible. *
☐ 11. Inappropriate. *

**UGI Printed Name/Signature:** _____

**Application of the screening criteria for this grievance is not expected to adversely Affect the offender's health.**

**Medical Signature Authority:**_____

**I-127 Back** (Revised 11-2010)

| OFFICE USE ONLY | |
|---|---|
| Initial Submission | UGI Initials:_____ |
| Grievance #: _____ | |
| Screening Criteria Used: _____ | |
| Date Recd from Offender: _____ | |
| Date Returned to Offender: _____ | |
| **2nd Submission** | **UGI Initials:_____** |
| Grievance #: _____ | |
| Screening Criteria Used: _____ | |
| Date Recd from Offender: _____ | |
| Date Returned to Offender: _____ | |
| **3rd Submission** | **UGI Initials:_____** |
| Grievance #: _____ | |
| Screening Criteria Used: _____ | |
| Date Recd from Offender: _____ | |
| Date Returned to Offender: _____ | |

Appendix F



Texas Department of Criminal Justice

**Accept as original**

# STEP 1

**OFFENDER**
**GRIEVANCE FORM**

OFFICE USE ONLY

Grievance #: 2021122334

Date Received: JUN 14 2021

Date Due: 7-24-21

Grievance Code: 300

Investigator ID #: I2731

Extension Date: _____

Date Retd to Offender: JUL 05 2021

---

Offender Name: John Henry Ramirez          TDCJ # 999544

Unit: Polunsky          Housing Assignment: 12AA01

Unit where incident occurred: Polunsky

---

**You must try to resolve your problem with a staff member before you submit a formal complaint. The only exception is when appealing the results of a disciplinary hearing.**

Who did you talk to (name, title)? Chaplain Hazelwood(Director of Chaplaincy TDCJ)When? June 8, 2021

What was their response? That I would NOT be allowed to have our Spiritual Advisor "touch" me during my execution!

What action was taken? NONE!

**State your grievance in the space provided. Please state who, what, when, where and the disciplinary case number if appropriate**

I requested to hAve my Spiritual Advisor "lay hands on me" during my upcoming execution, & was told that he would NOT be allowed to do so. It is part of my faith to have my spiritual advisor lay hands on me anytime I am sick or dying. TDCJ not allowing me that, is a violation of my Constitutional rights to practice my Religious Freedoms.

---

I-127 Front (Revised 11-2010)     **YOUR SIGNATURE IS REQUIRED ON BACK OF THIS FORM**     (OVER)

Appendix F

**Action Requested to resolve your Complaint.** That I be ALLOWED to have my Spiritual Advisor "lay hands on me" & pray over me while I am being executed?  THANK YOU!

**Offender Signature:** _[signature]_                                         **Date:** 6-11-21

**Grievance Response:**

*Your grievance has been investigated. At this time, a Spiritual Advisor is not allowed to touch an inmate while inside the execution chamber. No further action is warranted.*

**Signature Authority:** _[signature]_                                        **Date:** JUL 0 2 2021

If you are dissatisfied with the Step 1 response, you may submit a Step 2 (I-128) to the Unit Grievance Investigator within 15 days from the date of the Step 1 response. State the reason for appeal on the Step 2 Form.

**Returned because:** *Resubmit this form when the corrections are made.

- [ ] 1.  Grievable time period has expired.
- [ ] 2.  Submission in excess of 1 every 7 days. *
- [ ] 3.  Originals not submitted. *
- [ ] 4.  Inappropriate/Excessive attachments. *
- [ ] 5.  No documented attempt at informal resolution. *
- [ ] 6.  No requested relief is stated. *
- [ ] 7.  Malicious use of vulgar, indecent, or physically threatening language. *
- [ ] 8.  The issue presented is not grievable.
- [ ] 9.  Redundant, Refer to grievance # _____
- [ ] 10. Illegible/Incomprehensible. *
- [ ] 11. Inappropriate. *

**UGI Printed Name/Signature:** _____

**Application of the screening criteria for this grievance is not expected to adversely Affect the offender's health.**

**Medical Signature Authority:** _____

OFFICE USE ONLY

Initial Submission          UGI Initials: _____

Grievance #: _____

Screening Criteria Used: _____

Date Recd from Offender: _____

Date Returned to Offender: _____

2nd Submission              UGI Initials: _____

Grievance #: _____

Screening Criteria Used: _____

Date Recd from Offender: _____

Date Returned to Offender: _____

3rd Submission              UGI Initials: _____

Grievance #: _____

Screening Criteria Used: _____

Date Recd from Offender: _____

Date Returned to Offender: _____

I-127 Back (Revised 11-2010)                                         **Appendix F**

MAY 0 6 2021



## Texas Department of Criminal Justice

# STEP 2

### OFFENDER GRIEVANCE FORM

<table>
<tr><td colspan="2">OFFICE USE ONLY</td></tr>
<tr><td>Grievance #</td><td>2021095145</td></tr>
<tr><td>UGI Recd Date:</td><td>APR 21 2021</td></tr>
<tr><td>HQ Recd Date:</td><td>APR 26 2021</td></tr>
<tr><td>Date Due:</td><td>5-31</td></tr>
<tr><td>Grievance Code:</td><td>350</td></tr>
<tr><td>Investigator ID#:</td><td>12620</td></tr>
<tr><td>Extension Date:</td><td></td></tr>
</table>

Offender Name: John Henry Ramirez      TDCJ # 999544

Unit: Polunsky Unit      Housing Assignment: 12AA01

Unit where incident occurred: Polunsky Unit

---

*You must attach the completed Step 1 Grievance that has been signed by the Warden for your Step 2 appeal to be accepted. You may not appeal to Step 2 with a Step 1 that has been returned unprocessed.*

**Give reason for appeal (Be Specific).**   *I am dissatisfied with the response at Step 1 because...*

I am dissatisfied w/ the response to my Step 1 grievance because the issue was not addressed or remedied, on the violation of my Constitutional rights.  NOT being allowed a spiritual advisor in the death chamber w/ me during execution IS a violation of my right's to exercise my religious right's!  I ask that I be allowed my spiritual advisor in the death chamber present at the time of execution?  THANK YOU!

---

I-128 Front (Revised 11-2010)      **YOUR SIGNATURE IS REQUIRED ON BACK OF THIS FORM**      (OVER)

Appendix G

Offender Signature: _____   Date: 4-18-21

Grievance Response:

An investigation has been conducted by the Central Grievance Office. The Texas Department of
Criminal Justice (TDCJ) Execution Procedure was amended in April 2021. Section I reads:

"**(D)** *Upon the inmate's receipt of the Notification of Execution Date (Form 1), the inmate
shall have thirty (30) days to submit a request in writing to the Death Row Unit Warden to have
a TDCJ Chaplain or the inmate's spiritual advisor present inside the execution chamber
during the inmate's scheduled execution.*
**(E)** *The inmate's requested spiritual advisor must be included on the inmate's visitation list
and have previously established an ongoing spiritual relationship with the inmate
demonstrated by regular communications or in-person visits with the inmate before the
inmate's scheduled execution date.*
**(F)** *If an inmate requests to have a spiritual advisor present inside the execution chamber
during the inmate's scheduled execution, the inmate will provide the Death Row Unit Warden
with contact information for the spiritual advisor. Upon receipt of the spiritual advisor's
contact information, the Death Row Unit Warden shall contact the spiritual advisor.*"
You will need to follow the process described above. Given the time constraints, the 30-day
requirement to submit a request in Section I(D) will not be enforced against you. However, you
must submit a request as soon as possible. No further relief can be granted by this department.

Signature Authority _____   **J. RILEY**   Date: 5/4/2021

**Returned because:** *Resubmit this form when corrections are made.*

☐ 1. Grievable time period has expired.

☐ 2. Illegible/Incomprehensible.*

☐ 3. Originals not submitted. *

☐ 4. Inappropriate/Excessive attachments.*

☐ 5. Malicious use of vulgar, indecent, or physically threatening language.

☐ 6. Inappropriate.*

CGO Staff Signature: _____

| OFFICE USE ONLY | |
| --- | --- |
| **Initial Submission** | **CGO Initials:** _____ |
| Date UGI Recd:_____ | |
| Date CGO Recd:_____ | |
| (check one) ____ Screened ____ Improperly Submitted | |
| Comments: _____ | |
| Date Returned to Offender: _____ | |
| **2ⁿᵈ Submission** | **CGO Initials:** _____ |
| Date UGI Recd:_____ | |
| Date CGO Recd:_____ | |
| (check one) ____ Screened ____ Improperly Submitted | |
| Comments: _____ | |
| Date Returned to Offender: _____ | |
| **3ᵃᵈ Submission** | **CGO Initials:** _____ |
| Date UGI Recd:_____ | |
| Date CGO Recd:_____ | |
| (check one) ____ Screened ____ Improperly Submitted | |
| Comments: _____ | |
| Date Returned to Offender: _____ | |

I-128 Back (Revised 11-2010)                    Appendix G

# Tab 5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| **JOHN HENRY RAMIREZ**, | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | No. 2:20-cv-205 |
| **BRYAN COLLIER**, Executive Director, | § | |
| Texas Department of Criminal Justice, | § | **This is a Capital Case.** |
| Huntsville, Texas, | § | |
| | § | **Mr. Ramirez is** |
| **LORIE DAVIS**, Director, Texas Department | § | **scheduled to be** |
| of Criminal Justice, Correctional Institutions | § | **executed on** |
| Division, Huntsville, Texas, | § | **September 9, 2020.** |
| | § | |
| **BILLY LEWIS**, Warden, Texas Department | § | |
| of Criminal Justice, Huntsville, Unit, | § | |
| Huntsville, Texas, | § | |
| | § | |
| Defendants. | § | |

**RELATED CASE: Civil Action No. 2:12-CV-410; The Honorable Judge
v. Nelva Gonzalez Ramos**

## COMPLAINT PURSUANT TO 42 U.S.C. § 1983

Eric J. Allen
ALLEN LAW OFFICES
4200 Regent Street; Suite 200
Columbus, Ohio 43219
Tel. (614) 443-4840
eric@eallenlaw.com

Seth Kretzer
LAW OFFICE OF SETH KRETZER
440 Louisiana; Suite 1440
Houston, Texas 77002
Tel. (713) 775-3050
seth@kretzerfirm.com

*Appointed Counsel for John Henry Ramirez, Plaintiff*

**INTRODUCTION**

1.      On September 9, 2020, Plaintiff John Henry Ramirez is scheduled to be executed by lethal injection.

2.      For approximately four years, Pastor Dana Moore has ministered to Plaintiff Ramirez. Pastor Moore is an ordained Christian minister. He is the minister at Second Baptist Church in Corpus Christi, Texas.

3.      Plaintiff Ramirez wants Pastor Moore to be present in the execution chamber before and during his execution and has submitted grievance forms to posit this request.

4.      According to its stated, recently amended policy regarding the presence of spiritual advisors in the execution chamber, the Texas Department of Criminal Justice ("TDCJ") intends to deny Plaintiff Ramirez's request to have a chaplain present in the execution chamber at his execution. The execution violates the Free Exercise and Establishment Clauses of the First Amendment to the United States Constitution and substantially burdens the exercise of his religious beliefs protected by the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc et seq.

5.      Plaintiff Ramirez respectfully asks this Court to provide preliminary and permanent injunctive relief, barring TDCJ from executing Mr. Ramirez until that execution comports with the First Amendment and RLUIPA.

1

## JURISDICTION

6.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 1651, 2201, and 2202, and under 42 U.S.C. § 1983.

## VENUE

7.     Venue is proper under 28 U.S.C. § 1391 because Defendants Collier, Davis, and Jones maintain offices in Huntsville, Texas.

8.     Defendants are being sued in their official capacities.

9.     Venue is also proper because Plaintiff Ramirez's execution will occur in Huntsville, Texas.

## PARTIES

10.     Plaintiff John Henry Ramirez is incarcerated under a sentence of death at the Polunsky Unit of TCDJ in Livingston, Texas. He is scheduled to be executed on September 9, 2020.

11.     Defendant Bryan Collier is the Executive Director of TDCJ. He is being sued in his official capacity.

12.     Defendant Lorie Davis is the Director of the Correctional Institutions Division of TDCJ. She is being sued in her official capacity. Ms. Davis is the individual the trial court ordered to carry out the execution.

13.     Defendant Billy Lewis is the Senior Warden of the Huntsville Unit, which is the unit where executions take place. He is being sued in his official

capacity. Because Mr. Lewis is the Warden of the Huntsville Unit, he supervises executions in Texas.

## PROCEDURAL HISTORY

14.    Plaintiff Ramirez was indicted for capital murder, convicted, and sentenced to death. The Texas Court of Criminal Appeals affirmed the conviction and sentence on direct appeal. *Ramirez v. State*, No. AP-76,100 (Tex. Crim. App., March 16, 2011). A state writ was filed, a hearing was held, and the TCCA denied relief. *Ex parte Ramirez*, No. WR-72,735-03 (Tex. Crim. App., October 10, 2012).

15.    A federal writ was timely filed, and the district court denied relief and a certificate of appealability. *Ramirez v. Stephens*, No. 2-12-CV-410 (S.D. Tex., June 10, 2015).

16.    Plaintiff Ramirez filed a timely notice of appeal to the United States Court of Appeals for the Fifth Circuit. That court denied Mr. Ramirez's request for a certificate of appealability on February 4, 2016. Mr. Ramirez then requested a writ of certiorari from the Supreme Court on May 4, 2016. It denied that request on October 3, 2016.

17.    The State of Texas set an execution date on February 2, 2017.

18.    On January 27, 2017, Plaintiff Ramirez moved to substitute counsel and stay the execution date. This Court granted Mr. Ramirez's motion on January 31, 2017. Mr. Ramirez requested counsel and was given a briefing schedule on

3

February 12, 2018. On August 20, 2018, Mr. Ramirez filed a motion for relief from judgment in the United States District Court.

19.     The District Court denied this motion on January 3, 2019. Plaintiff Ramirez timely filed a notice of appeal to the Fifth Circuit. The Fifth Circuit denied the request on June 26, 2019. Mr. Ramirez requested and was granted an extension to file a petition for a writ of certiorari no later than October 24, 2019. That request was granted. But the Court denied Mr. Ramirez's request to grant certiorari.

20.     The State of Texas subsequently set an execution date of September 9, 2020.

## FACTUAL BACKGROUND

21.     On April 2, 2019, TDCJ adopted a revised execution procedure prohibiting any religious or spiritual advisors from entering the execution chamber at the time of the execution: "TDCJ Chaplains and Ministers/Spiritual Advisors designated by the offender may observe the execution only from the witness rooms." Ex. 1 at 8.

22.     The previous execution policy had allowed TDCJ-approved chaplains in the execution chamber, consistent with longstanding tradition in Texas and nationwide. The amendment appears to be in response to the Supreme Court's order staying an execution in *Murphy v. Collier*, 139 S. Ct. 1475 (2019). In

4

*Murphy*, the Supreme Court halted an execution after finding the TDCJ policy discriminate by denomination. In response, TDCJ changed its stated policy, not to approve spiritual advisors of all faiths but to bar all spiritual advisors.

23.     Since approximately 2016, Plaintiff Ramirez has received religious counseling and spiritual advice from his spiritual advisor, Pastor Dana Moore. Mr. Ramirez wants Pastor Moore to be present at the time of his execution to pray with him and provide spiritual comfort and guidance in his final moments. Pastor Moore is willing to be in the execution chamber with Plaintiff Ramirez when he is executed.

24.     When Plaintiff Ramirez is executed, Pastor Moore will pray with him. Pastor Moore need not touch Mr. Ramirez at any time in the execution chamber.

25.     TDCJ previously cleared Pastor Moore to be in its execution chamber when another condemned prisoner, Joseph Christopher Garcia, was executed in December 2018.

26.     Pastor Moore is willing to undergo additional security screening, if necessary, in order to be present in the execution chamber.

27.     On July 13, 2020, undersigned counsel contacted Kristen Worman, General Counsel of TDCJ, through email. That email inquired about whether Ms. Worman and TDCJ had made a decision regarding the presence of Plaintiff Ramirez's minister in the execution chamber. Ex. 2.

5

28.     On July 31, 2020, undersigned counsel followed up on his previous email. Through follow-up email, counsel informed Ms. Worman that Plaintiff Ramirez requested the presence of his Christian chaplain, Pastor Dana Moore and that Pastor Moore has ministered to Mr. Ramirez for approximately four years. The email informed Ms. Worman that TDCJ previously allowed Pastor Moore to be present in the death chamber for another condemned prisoner, Joseph Garcia. Finally, counsel informed Ms. Worman that Pastor Moore is willing to undergo additional security screening if necessary to enter the death chamber. Ex. 3.

29.     At the time of filing, General Counsel Worman had not responded to undersigned counsel's emails.

30.     Plaintiff Ramirez submitted a grievance to TDCJ on or about July 15, 2020. In the grievance, he requested that TDCJ allow Pastor Moore to be present in the execution chamber. TDCJ had not processed the grievance at the time of filing. It eventually should be returned to Plaintiff Ramirez with a response. Until then, Mr. Ramirez has no copy to present as an exhibit. If TDCJ responds, Mr. Ramirez can supplement this pleading.

31.     Plaintiff Ramirez also submitted an I-60 Offender Request to Official on or about August 7, 2020. He directed this request to the Warden of the Polunsky Unit. In that form, Mr. Ramirez again requested the presence of Pastor Moore in

the execution chamber. The Warden has not responded to Mr. Ramirez's request. If

he does, Mr. Ramirez can supplement this pleading.

## CLAIMS FOR RELIEF

32.     Plaintiff Ramirez re-alleges and incorporates by reference and the

allegations contained in the previous paragraphs of this Complaint.

## CLAIM ONE: FIRST AMENDMENT ESTABLISHMENT CLAUSE

33.     The First Amendment to the United States Constitution commands

that "Congress shall make no law respecting an establishment of religion." U.S.

Const., amend. I. This command also is binding on the states. *See Cantwell v.*

*Connecticut*, 310 U.S. 296, 303 (1940).

34.     The Establishment Clause also forbids governmental entities from

passing laws that prefer one religion over another, and it also forbids them from

demonstrating hostility toward a religion. *See Larson v. Valente*, 456 U.S. 228, 246

(1982); *Zorach v. Clauson*, 343 U.S. 306, 313-15 (1952); *Everson v. Bd. of Ed. of*

*Ewing Twp.*, 330 U.S. 1, 15 (1947) ("Neither a State nor the Federal Government .

. . can force nor influence a person to go to or to remain away from church against

his will or force him to profess a belief or disbelief in any religion.")

35.     TDCJ's amended policy precluding chaplains and spiritual advisors

from the execution chamber violates the Establishment Clause, because the policy

gives preference to non-religion while inhibiting the practice of religion. *See*

7

*Comm. for Public Ed. & Religious Liberty v. Nyquist*, 413 U.S. 756. 788 (1973) (noting that neutrality toward religion forbids the government from inhibiting religion).

36.     Laws or policies that are not neutral between religion and non-religion are inherently suspect. *See Larson*, 456 U.S. at 246. These types of laws or policies are upheld only if they survive strict scrutiny. And strict scrutiny requires the law or policy to be narrowly tailored to achieve a compelling interest. *Id.* at 246-47.

37.     In *Murphy v. Collier*, 139 S. Ct. 1475 (2019), the Supreme Court stayed an execution under TDCJ's previous execution policy. Under that policy, TDCJ followed a procedure to approve chaplains to be present in the execution chamber if they were not deemed a security threat. The Court stayed Murphy's execution, determining that the policy discriminated based on religious denomination. Afterward, TDCJ did not create a policy that applied the same clearance rules to all spiritual advisors. Instead, it chose to bar all spiritual advisors from the execution chambers. Ex. 1 at 8.

38.     This amended protocol denying all spiritual advisors favors non-religious prisoners who do not want or require spiritual advisors present in the chamber at their executions.

39.     The Supreme Court previously has stayed an execution under TDCJ's current execution policy. In *Gutierrez v. Saenz*, 590 U.S. ___ (2020), Gutierrez

8

attacked TDCJ policy of not allowing any spiritual advisors into the execution

chamber. He challenged that policy on First Amendment and RLUIPA grounds.

The Court stayed the execution "pending the disposition of his writ of certiorari"

and ordered the district court to promptly conduct fact finding on "whether serious

security problems" would result from allowing a spiritual advisor of the prisoner's

choice in the execution chamber.

40.     Plaintiff Ramirez raises the same challenge to the execution protocol

that Mr. Gutierrez did. Because the United States Supreme Court stayed Mr.

Gutierrez's execution and ordered the district court to conduct further fact-finding

about his challenge to the execution protocol, this Court must grant the injunctive

relief Plaintiff Ramirez seeks.

41.     TDCJ's intent to deny Mr. Ramirez access spiritual counseling during

the moments leading up to and including his execution cannot be justified by a

citation to security concerns. Any argument that security concerns justify such a

burden on Mr. Ramirez's religious observance is belied by the fact that TDCJ has

previously allowed Mr. Ramirez's spiritual advisor—Pastor Moore--to be in the

execution chamber during the execution of another prisoner, Joseph Garcia, in

December 2018. Furthermore, TDCJ cannot demonstrate that its current security

and screening protocols are inadequate, or that it could not address security

concerns with further screening measures, to which Pastor Moore has indicated he

is willing to submit.

## CLAIM TWO: FIRST AMENDMENT FREE EXERCISE OF RELIGION

42.     The First Amendment also requires that "Congress shall make no law

. . . prohibiting the free exercise of" religion. U.S. Const., amend. I. Like the

Establishment Clause, the Free Exercise Clause is binding on the states. *See*

*Cantwell*, 310 U.S. at 303.

43.     TDCJ's policy burdens Plaintiff Ramirez's free exercise of his

Christian faith in the moments just prior to and including his execution.

44.     When a state hinders a prisoner's ability to freely exercise his religion,

reviewing courts must determine whether the law or policy is neutral and generally

applicable. *Church of the Lukumi Balbao Aye, Inc. v. Hialeah*, 508 U.S. 520, 531

(1993). If it is neutral and generally applicable, it can have an "incidental effect of

burdening a particular religious practice." *Ibid*. If it is not neutral and generally

applicable, it must show a "compelling governmental interest" that is "narrowly

tailored to advance that interest." *Ibid*.

45.     Here, TDCJ's policy is not neutral. It is hostile toward religion,

favoring non-religious prisoners over religious prisoners. If Plaintiff Ramirez was

non-religious, TDCJ would grant his request to not have a religious advisor in the

execution chamber. And no compelling governmental interest justifies the

exclusion of Mr. Ramirez's spiritual advisor from the execution chamber, as

10

demonstrated by the fact that TDCJ previously allowed Pastor Moore into the chamber during Joseph Garcia's execution.

46.     Any argument that security concerns constitute a "compelling governmental interest" necessitating the exclusion of Mr. Ramirez's spiritual advisor from the execution chamber withers when subjected to strict scrutiny, as the Constitution requires. This is especially true in Plaintiff Ramirez's case. Here security concerns are less than compelling in light of the fact that in 2018, TDCJ allowed Pastor Moore to be present the execution chamber during the execution of Joseph Garcia's execution. TDCJ also has previously allowed prison chaplains who have served as spiritual advisors to be present in the chamber during executions. *See Murphy*, 139 S. Ct. at 1475.

47.     For these reasons, TDCJ's amended policy it violates the First Amendment's Free Exercise Clause cannot survive strict scrutiny.

### CLAIM THREE: RLUIPA

48.     If this Court finds TDCJ's policy does not violate Plaintiff Ramirez's First Amendment rights, it should rule that the policy violates RLUIPA.

49.     Separate and apart from the First Amendment, the Religion Land Use protects the rights of those who are incarcerated to worship as they please. does not follow First Amendment caselaw. Instead of referring to the First Amendment, the RLUIPA it defines the "exercise of religion" to include "any exercise of religion,

11

whether or not compelled by, or central to, a system of religious belief." *Burwell v. Hobby Lobby Stores*, 573 U.S. 682, 696 (quoting 42 U.S.C. § 2000cc-5(7)(A)).

50.     Even if TDCJ's amended policy does not violate the First Amendment, it violates RLUIPA because it burdens Mr. Ramirez's right to religious worship in the final moments leading up to and including his execution. Preventing Plaintiff Ramirez from religious worship with a chaplain at the end of his life and including the moment of his death substantially burdens his practice of religion. *See, e.g.*, *Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015) (determining that where a prisoner shows the exercise of religion "grounded in a sincerely held religious belief," enforced prohibition "substantially burdens his religious exercise").

51.     TDCJ has not employed the least restrictive means to further a compelling interest. TDCJ has the burden to show this defense. *See id.* at 859. In *Gutierrez*, the Supreme Court remanded for fact finding about the security issues of allowing a spiritual advisor in the execution chamber. This directive requires TDCJ to demonstrate that it has a "serious security problem" if the advisors are present. Here, TDCJ has allowed Plaintiff Ramirez's spiritual advisor into the execution chamber recently. Because it did so, TDCJ cannot plausibly claim to have such a compelling security interest when they remove a security-cleared spiritual advisor in this manner. In either event, fact finding is occurring at the

12

Supreme Court's direction. This Court should stay Mr. Ramirez's execution and allow this fact finding to occur. Then it can factor Mr. Ramirez's potentially unique circumstances into its finding.

52.     TDCJ's amended policy places a substantial burden on Plaintiff Ramirez's practice of a sincerely held religious belief at the moment of his death, when religious observance and spiritual guidance are most critical; therefore, it violates his rights under the RLUIPA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff John Henry Ramirez prays that this Court provide relief as follows:

1.     A declaratory judgment that TDCJ's amended policy violates Mr. Ramirez's First Amendment rights under the Establishment Clause;

2.     A declaratory judgment that TDCJ's amended policy violates Mr. Ramirez's First Amendment rights under the Free Exercise Clause;

3.     A declaratory judgment that TDCJ's amended policy violates Mr. Ramirez's rights under RLUIPA; and

4.     A preliminary and permanent injunction prohibiting Defendants from executing Mr. Ramirez until they can do so in a way that does not violate his rights.

Respectfully submitted,

/s/ Seth Kretzer

_____

Seth Kretzer
seth@kretzerfirm.com (email)
440 Louisiana , Suite 1440
(713) 775-3050 (Direct)
(713) 929-2019 (Fax)

## VERIFICATION

14

I, Seth Kretzer, attorney for the Plaintiff in the above-titled action, state that to the best of my knowledge and belief, the facts set forth in this Complaint are true.

Executed on August 7, 2020.

/s/ Seth Kretzer
Seth Kretzer

## CERTIFICATE OF SERVICE

I certify that I served a true and correct copy of the above pleading to the

following, via email, on August 7, 2020:

Jennifer Morris, Esq.
Criminal Appeals Division
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711
Email: jennifer.morris@oag.texas.gov

/s/ Seth Kretzer
Seth Kretzer

Exhibit 6

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

JOHN HENRY RAMIREZ,                    *
                                                                    Civil Action No. 2:12-CV-410
                 Petitioner,            *
                                                                    The Honorable Judge
        v.                              *          Nelva Gonzalez Ramos

LORIE DAVIS, Director,                  *
        Texas Department of Corrections,
        Correctional Institutions Division,    *

                 Respondent.            *

# CAPITAL CASE
# PENDING EXECUTION DATE:
# September 9, 2020

## ADVISORY TO THE COURT

COMES NOW, Petitioner Ramirez, and files this Advisory concerning developments in state court pertaining to his scheduled execution.

On August 11, 2020, Ramirez's counsel and AAG Morris reached agreement to 1) file an agreed motion to withdraw execution date and recall death warrant in the 94th Judicial District of Nueces County in exchange for 2) Ramirez filing a motion to non-suit without prejudice his recently filed Section 1983 suit in this Court; 2:20-cv-00205 *Ramirez v. Collier*.

The Agreed Motion is attached as exhibit 1; the proposed order is attached as Exhibit 2.

Judge Galvan has set this agreed motion for hearing on Friday, August 14 at 10:00 a.m. In the COVID paradigm, this hearing will be conducted on Zoom and it would not be practicable to transport Ramirez.  See Exhibit 3.

1

A court-reporter has been requested along with immediate transcription.

If the ruling is adverse, the undersigned will file mandamus with the Court of Criminal Appeals (likely also to be filed Friday) and will submit a copy to this Court also by way of Advisory.

Respectfully submitted,

/s/ Seth Kretzer

_____
Seth Kretzer
seth@kretzerfirm.com
TBN: 24043764
440 Louisiana , Suite 1440
Ph: 713 775 3050
Fax: 713 929 2019

## <u>CERTIFICATE OF SERVICE</u>

I certify that I have served the foregoing document via the Court's CM/ECF system on

Counsel for Respondent on this the 12th day of August 2020.

/s/ Seth Kretzer

Seth Kretzer

Exhibit 7



# Texas Department of Criminal Justice

---

**Bryan Collier**
Executive Director

*Via: eric@eallenlaw.com*

August 19, 2021

Eric Allen
Eric Allen Law
4200 Regent, Suite 200
Columbus, OH 43219

RE: John Henry Ramirez, TDCJ# 00999544

Mr. Allen:

The Texas Department of Criminal Justice (TDCJ) received your correspondence dated August 16, 2021, asking whether Mr. Ramirez's spiritual advisor is to remain silent upon entering the execution chamber and where the spiritual advisor will be standing throughout the procedure.

At this time, the TDCJ does not allow the spiritual advisor to pray out loud with the inmate once inside the execution chamber. In accordance with the TDCJ Execution Procedure policy, visitation with Mr. Ramirez's spiritual advisor may take place the morning of the scheduled execution at the Polunsky Unit. Mr. Ramirez may also request visitation with his spiritual advisor from 3:00 to 5:00 p.m. at the Huntsville Unit. During these times, the spiritual advisor will be permitted to pray out loud and provide spiritual guidance to Mr. Ramirez.

Once inside the execution chamber, the spiritual advisor will be positioned in a corner of the room where the individual must remain for the entirety of the procedure. Due to security concerns, the TDCJ will not disclose the precise distance of the spiritual advisor from the inmate while inside the execution chamber.

If you have further questions, please do not hesitate to contact this office.

Sincerely,

Kristen Worman
General Counsel

KLW/AML

*Our mission is to provide public safety, promote positive change in offender behavior, reintegrate offenders into society, and assist victims of crime.*
**Office of the General Counsel**

P.O. Box 13084 Capitol Station
Austin, Texas 78711-3084
Phone (512) 463-9899, FAX (512) 936-2159

P.O. Box 4004
Huntsville, Texas 77342-4004
Phone (936) 437-6700, FAX (936) 437-6994

www.tdcj.texas.gov