IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| **JOHN HENRY RAMIREZ,** | * |
| | * Civil Action No. 4:21-cv-2609 |
| Petitioner, | * |
| | * |
| v. | * |
| | * |
| **BRIAN COLLIER, et al.** | * |
| | * |
| Respondent. | * |

CAPITAL CASE
PENDING EXECUTION DATE:
September 8, 2021

**RAMIREZ'S REPLY TO STATE'S RESPONSE TO
MOTION FOR STAY OF EXECUTION
PENDING DISPOSITION OF PLAINTIFF'S COMPLAINT
FILED PURSUANT TO 42 U.S.C. § 1983 (DOC. NO. 13)**

Plaintiff Ramirez replies to Doc. No. 13 as follows.

### INTRODUCTION

Justice Kavanaugh recently issued a dissent as follows:

[I]t seems apparent that States that want to avoid months or years of litigation delays because of this RLUIPA issue should figure out a way to allow spiritual advisors into the execution room, as other States and the Federal Government have done. Doing so not only would satisfy inmates' requests, but also would avoid still further delays and bring long overdue closure for victims' families.

*Dunn v. Smith*, 141 S. Ct. 725, 726-27 (2021).

1

In the Defendants' view, their most recently revised policy clears the hurdle because a spiritual advisor may be inside the execution chamber—he just may not minister, or speak, or pray audibly, or do anything else. Ramirez submits that this is not what Justice Kavanaugh had in mind. The State's hostility to Pastor Dr. Moore's prayers is only inviting another of the "litigation delays" that his dissent counseled prison officials to avoid.

### I. PREVARICATING POLICIES ON SPIRITUAL ADVISORS KEEPS SHIFTING TO WHATEVER TDCJ THINKS CAN CLEAR THE SUPREME COURT'S IRREDUCIBLE MINIMUM UNDER THE FIRST AMENDMENT AND RLUIPA.

It is dizzying to watch the prevaricating policies TDCJ keeps spinning around. Defendants' response begins by conceding it acted unconstitutionally two years ago. The Supreme Court "[found] TDCJ's former policy unconstitutional for its denominational discrimination…". Doc. No. 13, p. 6.

The next step in the Defendants' reasoning is that the TDCJ responded by promulgating a new policy of dubious constitutionality—which it subsequently abandoned. *Compare* Doc. No. 13, p. 7 ("Shortly after Murphy's execution was stayed, TDCJ changed its protocol such that no religious advisors were permitted in the execution chamber.") *with* Doc. No. 13, p. 8 ("TDCJ released a revised Execution Procedure on April 21, 2021, which delineates a process for the approval of an inmate's spiritual advisor to be present in the execution chamber at the time of the execution.").

Curiously, the Response brief urges this Court to fault Ramirez with delay ("Ramirez waited four months before requesting from TDCJ the accommodation he now seeks." Doc. No. 13, p. 24), when TDCJ did not publish its "Policy Number Three" until **_months after_** Judge Galvan of the 94th District Court of Nueces County signed the current death warrant. In other words, Ramirez filed a new 1983 suit only after TDCJ took its third bite at the apple is as many years.

## II. THE STATE'S HOSTILITY TO A CONDEMNED MAN'S MODEST AND REASONABLE RELIGIOUS ACCOMMODATION REQUEST IS DEMONSTRATED IN ITS RESPONSE BRIEF.

There seems to be a thread of religious hostility throughout the State's shifting positions. The Response brief drives this point home in its section concerning Eastern religions:

> [T]he relief Plaintiff seeks will require TDCJ to accommodate blessing rituals from other religions, too. Where a Protestant may request his pastor's hands upon him as he passes, a Muslim may prefer for his body to be washed and shrouded immediately upon his passing, and a Buddhist, that his body be untouched for seven days after his death.

Doc. No. 13, p. 19.

One must politely ask, what of it? The washing and shrouding a body and untouching of a body for a respectful period hardly seem unduly burdensome. Please note that the Defendants offer no citations in support of their contentions about these putative- and evidently disfavored- burial rituals from other faiths, which one must observe have been practiced uncontroversially for millenia. Eastern faith

hypotheticals seem to miss the point. No one in the case *sub judice* is requesting a body to be washed or left untouched.

By contrast, Ramirez has introduced Pastor Dr. Moore's sworn statement, who respectfully explains the assistance in death that mere Christianity seeks to afford those facing imminent departure from this world. Mr. Ramirez's requests are modest and reasonable.

Apparently, Defendants' litigation strategy viz Doc. No. 13 is to hypothesize burdens that the State does not actually bear in this case- in order to argue against those polemical examples from the Muslim and Buddhist faiths they are so wary of and inimical to. In *United States v. Wilgus*, the Tenth Circuit observed in the analogous context of the Religious Freedom Restoration Act of 1993 that the government need not "do the impossible—refute each and every conceivable alternative regulation scheme" but need only "refute the alternative schemes offered by the challenger." 638 F.3d 1274, 1289 (10th Cir. 2011). Regardless, because the Defendants want to argue against a heightened burden they perceive from disfavored Eastern religions, the best course would be for this Court to stay the September execution-as State agreed to do last year- and for the Defendants to obtain and provide opinions of their own experts in religion, as appropriate.

### III. RAMIREZ'S RELIGIOUS BELIEFS AND DR. MOORE'S REQUEST TO ASSIST A MEMBER OF HIS CHURCH ARE SINCERE.

The Supreme Court has made clear that courts should not inquire into whether a prisoner prefers one sort of religious exercise over another. *Holt v. Hobbs*, 574 U.S. 352, 362 (2015) (holding the District Court erred by inquiring into whether all Muslims believe that men must grow beards); *Burwell v. Hobby Lobby Stores, Inc*., 573 U.S. 682, 725 (2014) (declining to question whether sincerely held beliefs "are mistaken or insubstantial"); *see also Cambridge Christian School, Inc. v. Fla. High School Athletic Ass'n, Inc.,* 942 F.3d 1215, 1247-1248 (11th Cir. 2019) ("The Supreme Court itself has consistently refused to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds."); ("In short, courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim.").

Unfortunately, the Defendants' hostility to Ramirez's religious precepts is expressed throughout Doc. No. 13. For example, on page 14, the Defendants write, "it does not allow the hands-on Protestant blessing (that he *recently decided* his religious beliefs require)." (Emphasis added). The Defendants inappropriately question the sincerity of Ramirez's religious beliefs, implying they are recently adopted for self-aggrandizement. Is it a legal parameter that protection of RLUIPA- no less the Free Exercise Clause- is "not limited to beliefs which are shared by all of the members of a religious sect." *Thomas v. Review Bd. of Indiana Employment Security Div*., 450 U.S. 707, 715–716, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981).

One must pause to note two passing points. First, does society welcome sincere changes of heart by criminals when they occur? Of course. *See, e.g.*, Dostoyevsky, Fyodor, "Crime and Punishment," (Emero Publishing 2012) (Raskolnikov expresses remorse. "How it happened he himself did not know, but suddenly it was as if something lifted him and flung him down at her feet. He wept and embraced her knees."); Dostoyevsky, Fyodor, "White Nights," The Best Short Stories of Fyodor Dostoevsky (ed. Modern Library, 2012) (ISBN: 9780307824080) ("I am told that the proximity of punishment arouses real repentance in the criminal and sometimes awakens a feeling of genuine remorse in the most hardened heart; I am told this is due to fear.").

Second, does not Jesus himself inform that all may find salvation at the door of death? *See Bible*, Luke 23:32-43 ("And he said unto Jesus, Lord, remember me when thou comest into thy kingdom. And Jesus said unto him, Verily I say unto thee, To day shalt thou be with me in paradise.") (King James version).

In any event, Rameriz's Christian faith is long standing, not recently converted. Pastor Dr. Moore has ministered to Ramirez since 2016 and that the "hands-on Protestant blessing" is part of his ministrations. *See Exhibit 2* (affidavit). If the State would like to depose Pastor Moore to explore Ramirez's "sincerity," it may do so: attached as *Exhibit 1* to this reply is Dr. Moore's current CV. Dr. Moore is a graduate of Baylor University (B.A. in religion and history) and Southwestern

Baptist Theological Seminary (Masters of Divinity and Ph.D. in Old Testament). Pastor Moore is an ordained minister who leads a congregation of roughly 200 people at Second Baptist Church in Corpus Christi, Texas. *See* https://2bc.org/about-us/.

Defendants are correct that Pastor Moore agreed to attend the State's "spiritual advisor training" on August 26 in a Huntsville shopping mall. Defendants' counsel insisted that Pastor Moore appear unrepresented by counsel:

> This email is to advise you that only Mr. Ramirez's spiritual advisor will be permitted to attend the orientation. The orientation is not an open forum and ***attorneys will not be permitted to attend.***

AAG Leah O'Leary, August 19, 2021 email (*see* Doc. No. 12, p. 7).

Below is the "Spiritual Advisory Participation and Non-Disclosure Agreement" that Pastor Moore was inveighed upon to sign; please note that none of the named Defendants in the case *sub judice* apparently attended the meeting- or signed this putative 'agreement. One "C.J. Hazelwood" signed as a "witness"; the name of the other "witness" is not legible in its cursive signature.

Also, please note that the copy reproduced below is the best that Counsel can get on the short timeline between the "training" that the Defendants set for the same day as the due date for the instant Reply brief. If the opportunity presents itself, Counsel can supplement the record with a fresh affidavit from Pastor Moore.



# SPIRITUAL ADVISOR PARTICIPATION & NON-DISCLOSURE AGREEMENT

I, **Dana Charles Moore**, hereby acknowledge and agree that I have been requested to participate as a spiritual advisor in the execution of **John Ramirez**, TDCJ No. **999544**, which is scheduled for **September 8, 2021**.

I further acknowledge and agree to follow the instructions and guidance received in the 2-hour, in-person orientation on **August 26, 2021**, and I will not engage in any behavior to disrupt the execution procedure.

I further acknowledge and agree that, if I engage in behavior deemed by the CID Director or designee to be disruptive to the execution procedure, I will be subject to immediate removal from the execution chamber and the TDCJ Huntsville Unit.

I further acknowledge and agree that I will keep confidential and will not disclose any information, including but not limited to the identities of employees of the Texas Department of Criminal Justice, members of the drug team, and any other participant in the above-referenced execution, that I may learn or obtain through my participation as a spiritual advisor in this execution.

I further acknowledge that if I disclose information I have learned or obtained through my participation as a spiritual advisor in the above-referenced execution, I may be subject to civil or criminal penalties under Texas Government Code §552.352 or Texas Penal Code §39.06, or both.

_____  
Spiritual Advisor Signature  
*Dana Moon*

*Dana Moore*  
Spiritual Advisor Printed Name

_____  
Witness Signature

*C.J. Hazlewood Jr.*  
Witness Printed Name

Date: August 26, 2021

Date: 26 Aug 2021

One glaring legal problem is manifest in the third paragraph of this "Spiritual Advisory Participation and Non-Disclosure Agreement":

> [I]f I engage in behavior deemed by the CID Director or designee to be disruptive to the execution procedure, I will be subject to immediate removal from the execution chamber and the TDCJ Huntsville Unit.

The final paragraph instantiates the religious 'gag order' by making Dr. Moore susceptible to state criminal prosecution if he "discloses information learned or obtain through participation as a spiritual advisor."

There is a chasm between General Counsel's letter (on official TDCJ stationary; see Doc. No. 12, Exhibit 7) and this "Spiritual Advisory Participation and Non-Disclosure Agreement." General Counsel was explicit that Pastor Moore may not pray out loud; but the 'agreement' that Dr. Moore was forced to sign earlier today leaves whatever conduct is permitted- or prohibited- to the whim and caprice of the Director during the execution.

In sum, the Defendants know that their latest 'new' policy is just as unconstitutional as the one struck down in Murphy, as well as the second policy that they walked away from months after Judge Galvan signed the current death warrant. The document handed to Pastor Moore earlier today may well be deliberately vague about the un-constitutional details, but the official letter from General Counsel is pellucid. The Defendants cannot hide the un-constitutional

9

policy they intend to affect during the execution by talking about it only in generalized and abstract terms *a priori*. Nor can the State insulate an unconstitutional policy from review by threatening Pastor Moore with some future criminal prosecution or civil penalty if he dares to talk about it. In sum, the State cannot get away with violating the First Amendment's religious protections by violating its free speech protections.

### IV. TDCJ SEEKS TO IMPOSE A RELIGIOUS GAG ORDER.

Most of pages 5-6 of Doc. No. 13 are devoted to various grievances filed by Ramirez and TDCJ's responses. A significant problem, however, is that TDCJ has enhanced the magnitude of its Constitutional violations since this case began. Attached as an exhibit to Ramirez's amended petition is a letter from that agency's General Counsel letter on official State stationary, dated August 19. In relevant part, General Counsel explains as follows on the reproduced portion of the letter on the following page:

The Texas Department of Criminal Justice (TDCJ) received your correspondence dated August 16, 2021, asking whether Mr. Ramirez's spiritual advisor is to remain silent upon entering the execution chamber and where the spiritual advisor will be standing throughout the procedure.

At this time, the TDCJ does not allow the spiritual advisor to pray out loud with the inmate once inside the execution chamber. In accordance with the TDCJ Execution Procedure policy, visitation with Mr. Ramirez's spiritual advisor may take place the morning of the scheduled execution at the Polunsky Unit. Mr. Ramirez may also request visitation with his spiritual advisor from 3:00 to 5:00 p.m. at the Huntsville Unit. During these times, the spiritual advisor will be permitted to pray out loud and provide spiritual guidance to Mr. Ramirez.

Once inside the execution chamber, the spiritual advisor will be positioned in a corner of the room where the individual must remain for the entirety of the procedure. Due to security concerns, the TDCJ will not disclose the precise distance of the spiritual advisor from the inmate while inside the execution chamber.

If you have further questions, please do not hesitate to contact this office.

Sincerely,

Kristen Worman
General Counsel

KLW/AML

*Our mission is to provide public safety, promote positive change in offender*

In other words, the Defendants are imposing what may be fairly described as an unholy Trinity of constitutional violations: 1) vocal prayer by a spiritual minister is prohibited as a member of his Church and his flock is dying; 2) a pastor may not read Scripture from the *Bible* aloud to his dying parishioner, and 3) Ramirez will not be able to hear any of the spiritual words of comfort by his Church and minister, or the Word of God, or the Holy Scriptures, all banned by the Defendants. These restrictions unreasonably burden Ramirez's religious beliefs when they matter most.

## V. THE DEFENDANTS' SUBSTANTIVE ARGUMENTS ABOUT RLUPIA ARE INCORRECT.

### A. Ramirez's Case Stands on its Own Feet.

In the State's urged conception, Ramirez is a tag-along case who is just trying to mirror-image the litigation success in *Murphy*. Doc. No. 13, p. 9 (Ramriez "poses to the Court the possibility that he might meet the substantial-case burden because Murphy did."). Incorrect.

### B. States' Hostilities to Plenary Spiritual Advisories Have Elicited Stays of Execution Across the Country in Recent Past.

As an initial matter, numerous executions across the country have been stayed recently on spiritual advisor grounds. As the State mentions, in June 2020, the Supreme Court granted a stay of execution and ordered the district court to develop a narrow factual issue: "whether serious security problems would result if a prisoner facing execution is permitted to choose the spiritual advisor the prisoner wishes to have in his ***immediate physical presence*** during the execution." *Gutierrez v. Saenz*, 141 S. Ct. 127, 128 (2020) (mem.) (emphasis added).

In compliance with the Court's order, the district court considered the evidence and briefs submitted by the parties and concluded that "no serious security problems would result" if death-sentenced inmates were permitted to have the spiritual advisors of their choosing to be present with them inside the execution chamber. *Gutierrez v. Saenz*, Case No. 19-cv-185 (S.D. Tex. 2019), Doc. 124, p. 2.

Upon review of the trial court's findings, the Supreme Court granted *certiorari*, vacated the Fifth Circuit's order, and remanded the case to the Fifth Circuit with instructions to remand to the district court for "further and prompt consideration" of Gutierrez's claims regarding the presence of a spiritual advisor inside the execution chamber. *Gutierrez v. Saenz*, No. 19-8695, 141 S. Ct. 1260 (Jan. 25, 2021) (mem).

Another execution was halted in *Dunn v. Smith*, 141 S. Ct. 725, 726 (February 11, 2021). Please note the bolded language below—"by his side"—which shows that the Supreme Court does not countenance the "substantial physical distance" that TDCJ insists must separate Pastor Moore from Ramirez's side during the execution:

> The State can do a background check on the minister; it can interview him and his associates; it can seek a penalty-backed pledge that he will obey all rules. *See Dunn v. Ray*, 586 U. S. ___, ___, 139 S. Ct. 661, 203 L. Ed. 2d 145 (2019) (Kagan, J., dissenting) (slip op., at 2). What the State cannot do, consistent with strict scrutiny, is simply presume that every clergy member will be untrustworthy—or otherwise said, that only the harshest restriction can work. *See Holt*, 574 U. S., at 369, 135 S. Ct. 853, 190 L. Ed. 2d 747.
>
> For these reasons, the Eleventh Circuit was right to bar Alabama from executing Smith without his pastor ***by his side.***

(Emphasis added).

By contrast, we know from General Counsel's August 19 letter that Pastor Moore decidedly cannot be "by [Ramirez's] side" because "TDCJ will not disclose the precise distance of the spiritual advisor from the inmate while inside the

13

execution chamber." Surely, the Defendants believe that the further away Pastor Moore is from Plaintiff the better; but any such physical distances stand at the polar opposite of the pastor being "by his side."

### C. The Prison Doctor Must Touch Ramirez's Hand to Pronounce Him Dead. Why Can Pastor Moore Not Touch the Other Hand?

The Religious Land Use and Institutionalized Persons Act (RLUIPA) provides "expansive protection" for prisoners' religious liberty. *Holt v. Hobbs*, 574 U.S. 352, 358 (2015). Under that statute, a prison may not "impose a substantial burden" on a prisoner's "religious exercise" unless doing so satisfies the Supreme Court's strict-scrutiny test: The challenged policy must be "the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000cc–1(a). That standard is "exceptionally demanding." *Holt*, 574 U.S. at 364. If any "less restrictive means is available for the Government to achieve its goals, then the Government must use it." *Id.*, at 365.

There is no point at which TDCJ's current policy will afford Pastor Moore the chance to lay his hands on Ramirez. Not during the hours before the execution. Not during the execution. Not even after the execution. We know this because General Counsel's August 19 letter tells us that prayers may only occur "between 3:00 and 5:00 at the Huntsville unit." But there are no contact visits in Huntsville. And Pastor Moore must stand like a potted plant "in a corner of the room" until he is told to

14

leave after the execution concludes.

In other words, while there are less restrictive methods available, the Defendants do not even attempt to satisfy them. Ramirez has shown a substantial likelihood of success on the merits of his claims.

## Conclusion

There is a likelihood that this Court will find that Ramirez's execution September 9, 2021, pursuant to Defendants' policies, would violate the First Amendment and the RLUIPA. If a stay is not granted, Ramirez will suffer an irreparable injury. He will be executed while being denied his right to exercise his religion. This injury outweighs the costs, if any, incurred by the Defendants if they are forced to reschedule Ramirez's execution for a later date, just as they did last year. Accordingly, Ramirez is entitled to a stay of execution so that this Court can consider his complaint filed pursuant to 42 U.S.C. § 1983. Ramirez is also entitled to a stay until the Defendants are able to and agree to carry out his execution in a manner consistent with the U.S. Constitution and federal law.

Respectfully submitted this 26th day of August 2021,

*/s/ Seth Kretzer*

_____

Seth Kretzer

seth@kretzerfirm.com
TBN: 24043764
9119 South Gessner, Suite 105

Houston, TX 77054  
Ph: 713 775 3050  
Fax: 713 929 2019

## **CERTIFICATE OF SERVICE**

I certify that I have served the foregoing Reply via the Court's CM/ECF system on Counsel for Respondent, Ms. Jennifer Morris, on this the 26th day of August 2021.

/s/ Seth Kretzer
**Seth Kretzer**